HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JEFFREY A. HEDGES,

                    Plaintiff,

                v.

FOSS MARITIME COMPANY,

                    Defendant.

IN ADMIRALTY

NO.  3:10-cv-05046 RBL

FINDINGS OF FACT AND
CONCLUSIONS OF LAW RE
EVIDENTIARY HEARING ON
MAINTENANCE AND CURE

This matter came on for an evidentiary hearing, before the Court, sitting without a jury, on May 14, 2015.  Plaintiff Jeffrey A. Hedges (Hedges) was represented by Robert M. Kraft, Richard J. Davies and Marissa A. Olsson of Kraft Palmer Davies P.L.L.C., and defendant Foss Maritime Company (Foss) was represented by Barbara L. Holland and Tyler A. Arnold of Garvey, Schubert & Barer.  The Court has considered the evidence presented at the hearing, the exhibits admitted into evidence, the arguments of counsel, and being fully advised, makes its Findings of Fact and Conclusions of Law as follows:

**FINDINGS OF FACT**

1.      At all times material, plaintiff Jeffrey A. Hedges (Hedges) was a resident of the Southern Division of the Western District of Washington.

1    2.    At all times material, defendant Foss Maritime Company (Foss) was a corporation

2    doing business in the Southern Division of the Western District of Washington, was the owner

3    and operator of the tug JUSTINE FOSS and Barge Z Big 1, and employed plaintiff as a member

4    of the crew of the tug JUSTINE FOSS.

5    3.    Hedges suffered a herniated disk while handling a heavy line working as a

6    deckhand on a Foss tug on February 25, 2009.  He continues to claim maintenance and cure.

7    The cause and extent of Hedges's claimed injury is disputed and was not the subject of the

8    evidentiary hearing.

9    4.    Hedges sought medical treatment in Lake Charles, Louisiana and was diagnosed

10   with a lumbar strain.  He received treatment and was declared fit for duty without restrictions on

11   June 12, 2009.

12   5.    Hedges returned to work as a deckhand on a Foss tug in Alaska in June 2009.  In

13   July 2009, he sought treatment for back pain and was flown home to Seattle.

14   6.    Hedges suffered a herniated disk at L5-S1, and has undergone a right L5-S1

15   hemilaminotomy and diskectomy for decompression of the exiting S1 nerve root by

16   neurosurgeon Peter Nora, M.D. on September 30, 2009.  After physical therapy, Dr. Nora

17   advised in June 2010 that no further surgery was indicated.

18   7.    In April 2010, Hedges submitted a Medical Evaluation Report to the U.S. Coast

19   Guard which reported that he was capable of performing all ordinary and emergency shipboard

20   tasks, and in which his doctor certified that he was physically competent to work.

21   8.    In July 2010, Ted Becker, PhD performed a physical capacities evaluation on

22   Hedges at the request of Plaintiff's counsel and reported that Hedges was capable of full time

23   work.

24

9.      On December 3, 2010, Hedges underwent an independent medical examination performed by Dr. James Pritchett, Chief of Orthopedic Surgery at Swedish Medical Center.  Dr. Pritchett testified that Hedges's condition was fixed and stable at that time, that he had reached maximum medical improvement, and that no additional curative treatment was indicated.  Dr. Pritchett also found that Hedges was capable of full time work as of June 2010.

10.     On February 1, 2011, Paul Schwaegler, M.D.,  did an L5-S1 re-exploration with re-do decompression, including excision of a large re-herniation and a fat graft.  Subsequently, the first part of a two part fusion procedure involving an anterior L5-S1 diskectomy, decompression, and fusion was performed by Dr. Schwaegler on June 11, 2012; the second part of the two part fusion, involving a posterior L5-S1 diskectomy, decompression, and fusion, performed by Dr. Schwaegler on June 28, 2012; and the removal of the surgical hardware that was the suspected cause of his ongoing chronic lower back pain and a neurolysis of the nerve roots to free them from infringement by surrounding structures, was performed by Dr. Schwaegler on November 5, 2013.

11.     With the exception of medical billings from Seattle Spine Institute, LLC related to the four surgeries performed by Dr. Schwaegler which are in dispute and not the subject of this hearing, Foss has paid maintenance and cure to Hedges since soon after the injury pursuant to its maritime obligation to pay maintenance and cure to a seaman injured in the service of its vessel.

12.     On May 14, 2014, Dr. Schwaegler referred Hedges to neurosurgeon Ryder Gwinn, M.D. for evaluation of whether Hedges would be a candidate for a spinal cord stimulator (SCS), which is an implanted, programmable neurotransmitter that interrupts pain signals to the brain by delivering small electrical impulses to the spinal column through stimulation leads.  Dr. Gwinn has been implanting SCSs since 2004, and estimated he implants approximately 60 to 70 SCSs annually.

13.     Hedges was seen by Dr. Gwinn on July 10, 2014, at which time Dr. Gwinn wrote that Hedges' "pain starts in the buttock, goes down the back of the right leg, then into the right foot in a (sic) L5 distribution."  Dr. Gwinn stated that Hedges was an "excellent candidate" for treatment with an SCS, and referred him to physical medicine and rehabilitation specialist Glen James David, M.D. for a trial SCS.

14.     Hedges was evaluated by Dr. David on September 28, 2014, and Dr. David wrote "38 y.o. year old gentleman with history of chronic lower extremity pain occurring due to post laminectomy syndrome.  Patient would be an excellent candidate for a trial for spinal cord stimulation to help improve patients (sic) function."

15.     Foss refused to authorize the implantation of the trial SCS, and on November 26, 2014, the parties filed cross-motions to have this Court determine whether Foss was obligated to pay for the trial SCS procedure under its maritime obligation of maintenance and cure.  On January 29, 2015, this Court entered an Order Granting Plaintiff's Motion to Compel Reinstatement of Cure and Denying Defendant's Motion for Declaratory Relief (dkt. #89), directing Foss to pay for the trial SCS.

16.     On February 26, 2015, Dr. David implanted the trial SCS on Hedges, and Hedges continued with the trial SCS in operation until March 4, 2014.  Hedges testified, and the Court finds, that he experienced functional improvement due to the reduction in his pain while undergoing the SCS trial, including the ability to walk farther, stand longer, and sit longer. Hedges further testified, and the Court finds, that he experienced improved cognitive function in that he had increased ability to concentrate while undergoing the SCS trial because he was less distracted by constant pain.

17.     Hedges returned to be evaluated by Dr. Gwinn on March 4, 2015, at the conclusion of the trial SCS period.  Dr. Gwinn at that time evaluated Hedges and the effects of

FINDINGS OF FACT AND CONCLUSIONS OF LAW RE
EVIDENTIARY HEARING ON MAINTENANCE AND CURE
3:10-cv-05046 RBL - 4

1    the SCS trial, and noted that during the trial period Hedges had experienced a 50% improvement

2    in his pain in 90% of the areas in which he experienced pain.   The Court has reviewed Dr.

3    Gwinn's deposition, and notes that Dr. Gwinn testified the SCS trial was a success, and that he

4    looks for the permanent SCS to provide functional improvement in terms of medication

5    reduction with regard to both regular and breakthrough medications, improvement in standing

6    and ambulating longer distances, and improvement in mood and sleep.   Dr. Gwinn testified there

7    is a greater than 50% chance that the permanent SCS would improve Hedges' function, and that

8    without the permanent SCS Hedges is likely to have a continued poor quality of life.   He further

9    testified that he felt with the SCS, Hedges "has a very good chance of having significant

10   improvement in his quality of life."

11        18.    Defendant Foss called orthopedic surgeon James W. Pritchett, M.D., who testified

12   he did not believe the permanent SCS would improve Hedges' function, and was unwarranted

13   under the circumstances of this case.   The Court is not persuaded by Dr. Pritchett's testimony.

14        19.    Dr. Pritchett's credibility was diminished by his testimony that the cause of

15   Hedges' pain was "non-specific," and Dr. Pritchett's characterization of the L5-S1 disk

16   herniation as an "incidental finding."   In support of this latter position, Dr. Pritchett testified the

17   MRI taken prior to Hedges September 30, 2009 surgery with Dr. Nora showed an L5-S1 "disc

18   protrusion," when in fact Dr. Nora's operative note of that date references a postoperative

19   diagnosis of "[r]ight L5-S1 radiculitis secondary to large disk herniation, right L5-S1."   Exhibit

20   7-001.   Dr. Schwaegler's February 1, 2011 operative report describes the procedure performed

21   on that date as an "[e]xceptionally difficult L5-S1 reexploration, with re-do decompression,

22   including excision large reherniation . . ."   Exhibit 7-003.   Dr. Gwinn testified, and the Court

23   finds, that Hedges' pain results from an injury to one of the nerve roots leading into his right leg

24   from either the February 25, 2009 injury or one of the subsequent therapies which flowed from

1   the initial injury.   The Court finds that Dr. Pritchett's refusal on cross-examination to

2   acknowledge a distinction between a "disk protrusion" and a "large disk herniation" is not

3   credible, and the Court does not accept Foss' argument that Hedges' pain is "non-specific" as a

4   basis for finding that a SCS is unwarranted.

5        20.     The Court also finds that Dr. Pritchett's testimony that Hedges could currently

6   return to work as an able seaman in the towing industry is not credible.   Physical capacity

7   evaluator Theodore Becker, Ph.D. determined in July 2010 that Hedges did not have the ability

8   to biomechanically undertake functions for body postures/positions that have been associated

9   with previous work applications on tug boats, exhibit A9-2, and Hedges has undergone four

10  lumbar surgeries and implantation of a trial SCS since that time.   The Court also observed

11  Hedges in the courtroom during the course of the evidentiary hearing, and Hedges has obvious

12  difficulty ambulating, and frequently needed to change positions from sitting to standing.   The

13  Court finds Dr. Pritchett's testimony regarding Hedges' ability to currently work in the towing

14  industry incredible.

15       21.     The Court finds the trial SCS did improve Hedges' function and condition

16  primarily through pain relief, and the permanent SCS recommended by Dr. Gwinn is intended to

17  improve Hedges' function and condition.   Foss is directed to authorize and pay for all treatment

18  related to the implantation of the permanent SCS, including but not limited to the thoracic MRI

19  which has been recommended by Dr. Gwinn.

20       22.     Hedges has stipulated that he is not currently receiving curative treatment from

21  Debra Achenbach, ARNP, or any other mental health professional.   He is not contending that

22  Foss owes a duty to pay maintenance and cure based upon psychological treatment.

23

24

FINDINGS OF FACT AND CONCLUSIONS OF LAW RE
EVIDENTIARY HEARING ON MAINTENANCE AND CURE
3:10-cv-05046 RBL - 6

1

## CONCLUSIONS OF LAW

2      1.      A vessel owner owes an injured seaman a non-delegable duty to furnish

3  maintenance and cure, independent of fault.  *Dise v. Express Marine, Inc.*, 476 Fed. Appx. 514,

4  520, 2011 AMC 2972 (4th Cir. 2011), *cert. denied*, 132 S. Ct. 2393 (2012).  "Maintenance" is a

5  per diem living allowance for food and lodging comparable to what the seaman is entitled to

6  while at sea; "cure" is payment of medical expenses incurred in treating the seaman's injury or

7  illness.  *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 528, 58 S. Ct. 651, 82 L. Ed. 993 (1938).

8  "The duty to provide cure encompasses not only the obligation to reimburse medical expenses

9  actually incurred, but also to ensure the seaman receives the proper treatment and care."

10  *Boudreaux v. United States*, 280 F.3d 461, 468, 2002 AMC 865 (5th Cir. La. 2002) (*citing*,

11  *Guevara v. Mar. Overseas Corp.*, 59 F.3d 1496, 1500 (5th Cir. 1995)).

12      2.      Where necessary for the seaman to obtain curative treatment, the vessel owner

13  must guarantee payment to medical providers in advance of treatment.  *Eldridge v. Star Line,*

14  2009 U.S. Dist. LEXIS 45265 (E.D. Mi. 2009) (ordering vessel owner to issue letter to

15  neurosurgeon guaranteeing payment prior to plaintiff's treatment); *Kezic v. Alaska Sea,* 2004

16  AMC 2376 (W.D. Wa. 2004) (ordering vessel owner to guarantee payment for neurological

17  testing); *Sullivan v. Tropical Tuna, Inc.,* 963 F. Supp. 42, 45, 1997 AMC 2017 (D. Ma. 1997)

18  (*citing Guevara*, 59 F.3d at 1500) ("In light of the realities of the current health care system, this

19  Court observes that an injured seaman often will be unable to obtain necessary medical treatment

20  unless he can first demonstrate the ability to pay . . . . [A] shipowner's duty to pay maintenance

21  and cure encompasses a duty to guarantee payment prior to treatment. . ."); *Etheridge v. Rainier*

22  *Investments, Inc.,* 1998 AMC 2978, 2981 (D. Ak. 1998) (awarding attorney's fees related to

23  motion to reinstate maintenance and cure after vessel refused to guarantee payment for surgery).

24

A shipowner's duty to pay maintenance and cure is "virtually automatic." *Baucom v. Sisco Stevedoring, LLC*, 506 F. Supp. 2d 1064, 1073 (S.D. Ala. 2007).

3.      "Policy considerations have led to the adoption of a somewhat paternalistic attitude toward seamen." *Perry v. Morgan Guaranty Trust Co.*, 528 F.2d 1378, 1379 (5th Cir. 1976); *see also, Miles v. Apex Marine Corp,* 498 U.S. 19, 36, 111 S. Ct. 317, 112 L. Ed. 2d 275 (1990) ("admiralty courts have always shown a special solicitude for the welfare of seamen and their families"); *Messier v. Bouchard Transp.*, 688 F.3d 78, 82, 2012 AMC 2370 (2d Cir. 2012) ("The policy underlying a broad maintenance and cure doctrine is 'the almost paternalistic duty' admiralty law imposes on a shipowner toward the crew.").

4.      "The shipowner's duty to pay maintenance and cure 'continues until the seaman . . . reaches the point of maximum medical recovery.'" *Dean v. Fishing Co. of Alaska, Inc.*, 177 Wn.2d 399, 406 (2013) (*citing* 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 6-28, at 393 (4th ed. 2004); *Farrell v. United States*, 336 U.S. 511, 522-23, 69 S. Ct. 707, 93 L. Ed. 850 (1949)).  Maximum cure is achieved when it appears probable that the seaman's condition is cured or is recognized as incurable, that is, further treatment will result in no betterment of the seaman's condition and is simply for pain relief.  *Pelotto v. L & N Towing Co.,* 604 F.2d 396, 400 (5th Cir. 1979); *accord*, *Johnson v. Marlin Drilling Co.,* 893 F.2d 77, 79, 1990 AMC 2460 (5th Cir. 1990); *Gaspard v. Taylor Diving & Salvage Co., Inc.,* 649 F.2d 372, 374 n. 3 (5th Cir. 1981).

5.      Treatment need not be intended to return a seaman to work in order to be considered "curative."  Seamen suffering from permanent and incurable conditions are entitled to maintenance and cure until the point their "condition has stabilized and further progress ended short of a full recovery."  *In re RJF Int'l Corp.*, 354 F.3d 104, 106 (1st Cir. 2004) (holding that where a seaman suffered a serious brain injury which reduced his mental capacity to that of an

1   18-24 month old, treatment which had the potential to provide cognitive improvement and help

2   the seaman cope with muscle spasticity and contraction was "curative").

3      6.   If any doubts exist as to whether a seaman is entitled to coverage, whether the

4   medical treatment is necessary, or whether maximum cure has been obtained, courts have

5   resolved disputes in favor of the seaman and in favor of granting payment of medical expenses.

6   *Moore v. The Sally J.*, 27 F. Supp. 2d. 1255, 1262 (W.D. Wa. 1998)(*citing Vella v. Ford Motor*

7   *Company*, 421 U.S. 1, 95 S.Ct. 1381, 43 L.Ed. 2d 682, 1975 A.M.C. 563 (1975).

8      7.   This Court held in its January 29, 2015 Order Granting Plaintiff's Motion to

9   Compel Reinstatement of Cure and Denying Defendant's Motion for Declaratory Relief "[a]

10  treatment is curative even if the increased function is accomplished primarily through pain

11  relief." Dkt. #89, p. 6, ll. 2-3.  This holding is consistent with district court decisions in *Lee v.*

12  *Metson Marine Servs.,* 2012 U.S. Dist. LEXIS 155957, *3 (D. Haw. 2012) (denying shipowner's

13  motion to terminate benefits where SCS implant was recommended) (quoting *Messier v.*

14  *Bouchard Transp.*, 756 F. Supp. 2d 475, 481 (S.D.N.Y. 2010) ("The obligation to 'cure' a

15  seaman includes the obligation to provide him with medications and medical devices that will

16  improve his ability to function, even if they do not improve his actual condition")); *Kuithe v.*

17  *Gulf Caribe Maritime, Inc.*, 2010 U.S. Dist. LEXIS 89661, *24 (S.D. Ala. 2010) ("treatment that

18  improves condition by allowing remunerative activity previously precluded by pain does

19  constitute cure"); *Mabrey v. Wizard Fisheries, Inc.,* 2008 U.S. Dist. LEXIS 9985, 13-14 (W.D.

20  Wa. 2008) (concluding that the need for pain medication was "more than palliative" because it

21  would help improve the seaman's condition).  The Court has found that the permanent SCS at

22  issue is intended to increase Hedges' function and condition primarily through pain relief, and

23  concludes as a matter of law that such treatment is therefore curative and the obligation of

24  defendant Foss.

FINDINGS OF FACT AND CONCLUSIONS OF LAW RE
EVIDENTIARY HEARING ON MAINTENANCE AND CURE
3:10-cv-05046 RBL - 9

8.      Foss bears the burden of proving by a preponderance of the evidence that Hedges has reached maximum cure.  *Debbie Flo, Inc. v. Shuman*, 2014 AMC 840 (D.N.J. 2014) ("It is the vessel owner's burden to prove that MMI, or maximum cure, has been attained by the injured seaman.") (*citing Smith v. Delaware Bay Launch Serv., Inc.*, 972 F. Supp. 836, 848 (D. Del. 1997)); *Haney v. Miller's Launch, Inc.*, 773 F. Supp. 2d 280, 290 (E.D.N.Y. 2010) (the employer has the burden of showing the seaman has reached maximum cure); *Gouma v. Trident Seafoods, Inc.,* 2008 U.S. Dist. LEXIS 108278 (W.D. Wa. 2008) (a seaman "is entitled to a presumptive continuance of maintenance and cure payments"); *Smith v. F/V Marauder*, 2003 AMC 1308 (W.D. Wash. 2003) ("The shipowner has the burden of proving that maximum cure has been attained.").  Foss has failed to meet its burden of proof on the question of whether Hedges has reached maximum cure, and Foss is directed to authorize and pay for all treatment related to the implantation of the permanent SCS, including but not limited to the thoracic MRI which has been recommended by Dr. Gwinn, and any follow-up treatment until the time there has been a medical determination Hedges has reached maximum cure.

9.      Plaintiff Hedges' claim for compensatory damages, punitive damages and attorney's fees related to Foss' wanton and willful disregard for its obligation to pay cure is reserved to the time of trial.

DATED this 29th day of May, 2015.


RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE

FINDINGS OF FACT AND CONCLUSIONS OF LAW RE
EVIDENTIARY HEARING ON MAINTENANCE AND CURE
3:10-cv-05046 RBL - 10